# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| CITY OF DAYTON, | : | |
| Plaintiff, | | Case No. 3:11-cv-383 |
| -vs- | : | Magistrate Judge Michael J. Newman (Consent Case) |
| A.R. ENVIRONMENTAL, INC., *et al.*, | | |
| Defendants. | : | |

## ENTRY OF DEFAULT JUDGMENT AND DAMAGES AGAINST DEFENDANT A.R. ENVIRONMENTAL, INC.

This is a consent case for which the default of Defendant A.R. Environmental, Inc. ("A.R.") is now at issue. The statutory agent for A.R. executed a waiver of service of summons on behalf of A.R. on December 28, 2011. Doc. 5. Since then, however, A.R. has not made any appearance in this case: it never filed an answer or otherwise defended against the complaint; nor did it respond to the Court's *sua sponte* Show Cause Order (doc. 44), the Clerk's entry of default (doc. 53), or Plaintiff's motion for default judgment (doc. 56). *See* doc. 66.

Accordingly, the Court held a default judgment hearing on June 29, 2012. *See* doc. 102. Attorney John Musto appeared on behalf of Plaintiff City of Dayton ("City"), presenting testimony from two City employees: William O'Connell and Kevin Klein. *Id.* Mr. Musto also admitted nineteen exhibits into evidence, including an affidavit of a former employee of A.R., Joseph Knipp.[1] *See id.* The evidence introduced at the hearing – which remains unchallenged by A.R. – demonstrates a pattern and practice by A.R. of (1) contracting with the City to perform

---

[1] These nineteen exhibits are on file with the Clerk's office. The Court will refer to the exhibits admitted at the damages hearing as "Ex. 1," "Ex. 2," *etc.*

asbestos abatement work and demolition activities on properties in the City; (2) failing to do that work (in breach of the parties' multiple contracts) and, in many instances, intentionally burying asbestos in or on the grounds of the City properties (in violation of state and/or federal environmental laws); and (3) advising the City that the work was legally performed, and being paid by the City. The undisputed evidence demonstrates that A.R.'s conduct was a breach of the parties' agreements, as well as a violation of controlling environmental laws. Given this rather disturbing pattern and practice, the Court finds the City entitled both to compensatory and punitive damages as more fully set forth, and for the reasons, discussed below.

When a defendant is in default, the well-pleaded allegations of the complaint – as they relate to that defendant's liability – are accepted as true, but the allegations concerning the plaintiff's damages are not. *See Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 110 (6th Cir. 1995). Thus, the plaintiff must prove its damages by a preponderance of the evidence. *See Anderson v. Wade*, 33 F. App'x 750, 756 (6th Cir. 2002); *see also Doe v. Bone*, No. 2:11-cv-453, 2012 U.S. Dist. LEXIS 115555, at *2-3, 2012 WL 3544754, at *1 (S.D. Ohio Aug. 16, 2012). The evidence introduced at the Court hearing – all of which is undisputed by A.R. – demonstrates by a preponderance of evidence as follows:

## I. Background

This case arises out of three contracts entered into between the City and A.R. to perform abatement work (asbestos surveys and remediation) and demolition activities on more than 40 properties located in the City of Dayton. Under the contracts, A.R. was required to comply with federal, state and local laws and regulations in performing its work, including filing the correct paperwork with the appropriate regulatory agencies (*e.g.,* the Regional Air Pollution Control Agency "RAPCA"), and obtaining demolition permits from the City. *See* doc. 102 at PageID

554-59; Exs. 1-3. The evidence before the Court demonstrates that A.R. failed to comply with these requirements with respect to nearly all the properties. Consequently, the City received multiple "Notice[s] of Violation" from RAPCA. *See* Exs. 6, 17-19.

Under one of the contracts here at issue, the City paid A.R. $247,475.00 to perform asbestos remediation work at three properties (333 Cambridge, 1230 Euclid and 2800 Jerome) based on the City's belief that the work was actually completed. Doc. 102 at PageID 556-57; Ex. 5. The City subsequently learned, however, that A.R. submitted a false asbestos survey with respect to the structure located at 2800 Jerome Avenue, and then falsely claimed that it had removed this fictional asbestos containing material ("ACM"). *See* doc. 102 at PageID 557-58. Specifically, A.R.'s survey reported that there was 2,890 linear feet of thermal system insulation ("TSI") (asbestos pipe rap) in the basement of 2800 Jerome, *see* Ex. 7 – a statement that is refuted by overwhelming evidence that there was not, in fact, any TSI in the structure at 2800 Jerome. First, there was no basement. *See* doc. 102 at PageID 558. Second, a previous asbestos survey had not reported any TSI there.[2] *See id.* at PageID 559-60. Third, based on A.R.'s own survey, it appears the testing samples taken from 2800 Jerome were not even provided to the laboratory until after A.R. had allegedly removed the asbestos.[3] *See* doc. 102 at PageID 561-63; Ex. 7. Fourth, when representatives from the City and RAPCA inspected the structure prior to the demolition (and after A.R. had allegedly removed the TSI), they did not find any evidence that the structure ever contained TSI.[4] *See* doc. 102 at PageID 562-63; Ex. 6.

---

[2] The City employee that contracted with A.R. to remediate at 2800 Jerome Avenue did not realize that an environmental survey had already been performed there. *See* doc. 102 at PageID 561-62.

[3] It is impossible to perform an asbestos survey identifying the percentage of asbestos content without first sending the samples to a laboratory for confirmation. *See* doc. 102 at PageID 562.

[4] Likewise, representatives from the City and RAPCA were unable to locate where the TSI had allegedly been removed in the structures at 333 Cambridge and 1230 Euclid. *See* Ex. 6.

Not only did A.R. obtain payment for removing non-existent TSI, it failed to remove the existing ACM.  For instance, A.R. demolished the structure at 2800 Jerome without removing the asbestos in the drywall.  *See* doc. 102 at PageID 559-60; Ex. 6.  RAPCA representatives inspected the demolition site at 2800 Jerome (which was in a residential neighborhood), "observ[ing] dry, friable ACM surfacing material mixed throughout all the demolition debris, no evidence of water or emission controls, and no barriers or signage warning of the asbestos hazards."  Ex. 6 at 2.  As a result, and pursuant to RAPCA's request, the City hired another environmental contractor to cover and seal the debris pile until it was properly cleaned.  Doc. 102 at PageID 560-61.  The City paid $10,367.70 for these services.  Ex. 8.

Additionally, A.R. failed to complete the asbestos remediation at three different sites (416-18 North Williams Road, 302 Xenia Avenue, and 916-18 Catalpa) even though the City paid A.R. for completing this work.  *See* doc. 102 at PageID 563-65; Ex. 11.  As a result, the City was required to pay another contractor $9,376.43 to complete the work.  *See* doc. 102 at PageID 563-65; Ex. 9.

Moreover, the evidence demonstrates that A.R. illegally buried asbestos at more than 40 properties in the City, rather than properly disposing of it at approved sites, as was required under the parties' contracts.  *See* doc. 102 at PageID 565; Ex. 12.  This was verified by an affidavit of Joseph Knipp – a former employee of A.R.  *See* Ex. 12.  He swore that Defendant Penland (A.R.'s President) and Reuben Peppers (an A.R. executive) "instructed that any asbestos scrap left at a site for work that A.R. performed under the Contracts be buried at the site, and usually in the hole of the demolished structure."  Ex. 12 ¶ 5.  At each site, "approximately a five gallon bucket to a wheel barrow full of asbestos[] was buried."  *Id.*  At one site (2800 Guthrie Road), A.R. waited for the City inspection, and then buried approximately 15 cubic yards of

4

asbestos in a hole in addition to approximately 40 truck-loads of concrete and other demolition debris. *Id.* ¶ 7. In fact, according to Mr. Knipp, of the numerous structures at issue in the contracts, only the asbestos from two sites was actually taken to an approved disposal site. *Id.* ¶ 10. It is estimated that it will cost the City $115,000.00 to find and properly remove all the asbestos buried at these 40 properties.[5] Doc. 102 at PageID 165-66; Ex. 13.

A.R. illegally buried the largest amount of asbestos at a vacant warehousing facility located at 306 Hopeland Avenue, which is known as the "Concord Site." *See* doc. 102 at PageID 568-69; Ex. 12 ¶ 3. (A.R. was using this property as a staging area without the City's permission. *See* doc. 102 at PageID 568-69.) It buried approximately 60 cubic yards of asbestos there and covered it with 8 feet of dirt fill. Ex. 12 ¶ 4. The City paid an environmental contractor $9,875.40 to inspect the Concord Site to confirm that asbestos was buried there. *See* Exs. 14, 15. The contractor estimated that it will cost $61,000 to remediate the Concord Site. *See* doc. 102 at PageID 571-72; Ex. 16.

## II. Compensatory Damages

Based on this evidence, the Court finds that the City is entitled to the following compensatory damages: (1) $247,475.00 paid to A.R. for asbestos work that was not properly performed at 2800 Jerome, 333 Cambridge, and 1230 Euclid; (2) $10,367.70 for emergency remediation work at 2800 Jerome (as a result of A.R. demolishing the building without removing the asbestos); (3) $9,376.43 paid to other contractors to remove asbestos from the structures at 916-18 Catalpa, 416-18 North Williams, and 302 Xenia (because A.R. failed to perform that

---

[5] The affidavit further states that A.R. failed to properly demolish some of the structures – *e.g.*, leaving much of the foundation and other debris buried in a hole at the property. Ex. 12 ¶ 8. Moreover, at four properties, when A.R. was unable to locate the sewer drain so it could fill it with concrete (as required), it inserted a different pipe filled with concrete in the ground "to fool the City inspector into thinking that the sewer connection was plugged." Ex. 12 ¶ 9.

work); (4) $115,000.00 to remediate the more than 40 properties in the City where A.R. illegally buried asbestos; (5) $9,875.40 paid to a contractor to investigate the asbestos buried at the Concord Site; and (6) $61,000.00 to remediate the Concord Site. Accordingly, the City is entitled to a total of $453,094.53 in compensatory damages from A.R.

### III. Punitive Damages

The City further seeks punitive damages in the sum of twice the compensatory damages - $906,189.06. Such damages are reviewed under state law.[6] "The purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct." *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 871 (Ohio 1998). Under Ohio law, punitive damages are generally not recoverable in an action for breach of contract. *Digital & Analog Design Corp. v. N. Supply Co.*, 540 N.E.2d 1358, 1367 (Ohio 1989). However, there is an exception to that rule "where the breach of contract is accompanied by a connected, but independent tort involving fraud, malice or oppression." *Mabry-Wright v. Zlotnik*, 844 N.E.2d 858, 862 (Ohio Ct. App. 2005) (citation omitted); *see also Koehler v. PepsiAmericas, Inc.*, 268 F. App'x 396, 407 (6th Cir. 2008) (discussing Ohio law); *Lake Ridge Acad. v. Carney*, 613 N.E.2d 183, 187 (Ohio 1993); *Saberton v. Greenwald*, 66 N.E.2d 224, 228-31 (Ohio 1946). The City has already established that A.R. breached its contract. *See supra*. Thus, in order to recover punitive damages, the City must additionally prove that: (1) A.R. committed a tort, in connection with, but independently of, the

---

[6] The Court – exercising supplemental jurisdiction over the City's state law breach of contract and tort claims – applies Ohio law. *See Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999). In doing so, the Court must apply the law of Ohio's highest state court (*e.g.,* the Ohio Supreme Court). *See Mich. First Credit Union v. CUMIS Ins. Soc'y, Inc.*, 641 F.3d 240, 251-52 (6th Cir. 2011). "If, however, the state's highest court has not decided the applicable law, then the federal court must ascertain the state law from all relevant data. An intermediate appellate court's judgment that announces a rule of law is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* (internal citations omitted). This rule applies regardless of whether the appellate court decision is published or unpublished. *See Talley v. State Farm Fire & Cas. Co.*, 223 F.3d 323, 328 (6th Cir. 2000).

breach of contract; and (2) A.R.'s tortious conduct was wanton, reckless, malicious, or oppressive in nature. *See Mabry-Wright*, 844 N.E.2d at 862; *see also Logsdon v. Graham Ford Co.*, 376 N.E.2d 1333, 1335-36 (Ohio 1978).

### A. Tort Requirement

With respect to the tort requirement, the City claims A.R.'s conduct constitutes fraud, a tort under Ohio law. *See* doc. 91 at PageID 507-08. The elements necessary to establish fraud are:

> (1) a representation (or concealment of a fact when there is a duty to disclose) (2) that is material to the transaction at hand, (3) made falsely, with knowledge of its falsity or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, and (4) with intent to mislead another into relying upon it, (5) justifiable reliance, and (6) resulting injury proximately caused by the reliance.

*Volbers-Klarich v. Middletown Mgmt.*, 929 N.E.2d 434, 440 (Ohio 2010).

The Court finds that the City has proven these elements by a preponderance of the evidence. A.R. made false and material representations to the City – *i.e.,* that it had removed and properly disposed of the ACM contained in the more than 40 structures at issue in the parties' contracts; and that there was TSI in the building at 2800 Jerome. These representations were made, if not with knowledge of their falsity, at least with such recklessness and utter disregard for the truth that A.R.'s knowledge of their falsity may be inferred. *Cf. Russ v. TRW, Inc.*, 570 N.E.2d 1076, 1083-84 (Ohio 1991) (finding that the "knowledge of falsity" element could be inferred from the defendant's conduct and/or circumstances); *Smith v. Baker,* No. 15632, 1996 Ohio App. LEXIS 3133, at *4-7, 1996 WL 409218, at *2-3 (Ohio Ct. App. June 28, 1996) (same). As Joseph Knipp's affidavit demonstrates, the illegal burial of ACM on the properties was intentional – *i.e.,* A.R. employees were expressly instructed by management to bury the ACM on-site. *See* Ex. 12 ¶ 5. Likewise, A.R.'s asbestos survey – claiming that more than 2,800

feet of TSI existed at 2800 Jerome – was made with at least recklessness, given that there was not even a basement there.  Further, based on the undisputed evidence, it can reasonably be inferred that A.R. intended to mislead the City, and the City justifiably relied upon these false representations.  *See, e.g.,* Ex. 12 ¶ 7 (Knipp Aff.) (stating that A.R. waited until a property was inspected by the City and then dumped the asbestos and demolition debris in a hole there); *id.* ¶ 9 (stating that Defendant Penland inserted a pipe into the ground and filled it with concrete "in order to fool the City inspector into thinking that the sewer connection was plugged").

The evidence further demonstrates that the City was injured due to its reliance on, and as a proximate cause of, A.R.'s false representations.  The City paid A.R. $247,475.00 because it reasonably believed A.R.'s false representations – that A.R. had properly completed the work required under the contracts.  Moreover, the City has incurred and/or will incur $205,619.53 in costs to perform the work that A.R. failed to complete, and to attempt to rectify the damage caused by A.R.'s tortious conduct.  Therefore, the City has established that A.R. committed the tort of fraud under Ohio law.

### B. "Malicious Conduct" Analysis

The analysis does not end there, however.  The City must also show that A.R.'s conduct was "malicious or oppressive in nature."[7]  *Mabry-Wright*, 844 N.E.2d at 862.  In this case, the City claims A.R. acted maliciously.  The City may prove that A.R. acted maliciously by showing that its conduct was either "characterized by hatred, ill will or a spirit of revenge" or demonstrated "a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm."  *Calmes v. Goodyear Tire & Rubber Co.*, 575 N.E.2d 416, 419 (Ohio 1991).

---

[7] To recover punitive damages, the City must show fraud aggravated by malicious or egregious conduct. *See Logsdon*, 376 N.E.2d at 1336 n.2.

Here, the Court finds that A.R.'s malice can be inferred from its conscious disregard for the rights and safety of the public. *Cf. Solly v. Manville Corp.*, Nos. 91-3081, 91-3196, 91-3082, 1992 U.S. App. LEXIS 14030, at *19-22, 1992 WL 125386, at *7-8 (6th Cir. June 8, 1992) (affirming an award of punitive damages under Ohio law based on a manufacturer's conscious disregard of its workers' safety, by exposing them to asbestos). Exposure to asbestos can lead to the development of serious diseases, such as mesothelioma, lung cancer and asbestosis. *See Ins. Co. of N. Am. v. Forty-Eight Insulations*, 633 F.2d 1212, 1214-15 (6th Cir. 1980) (explaining the health risks of being exposed to asbestos particles); *Adkins v. GAF Corp.*, 706 F. Supp. 559, 561 (S.D. Ohio 1988) ("Asbestos exposure causes asbestosis. This fact was general knowledge in the asbestos industry in the State of Ohio at least after 1945"). If asbestos is not properly removed from a building before demolition, large quantities of asbestos fibers may be released into the air during demolition – "[s]uch a release would pose a significant health risk to the public." *Univ. of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1279 n. 2 (6th Cir. 1995). Further, asbestos buried underground is likewise dangerous because it creates a risk that asbestos fibers will later be released into the air if there are construction activities on that property. *See Richmond Am. Homes of Colo., Inc. v. United States*, 75 Fed. Cl. 376, 399 (2007). For these reasons, there are stringent regulations that must be adhered to when removing ACM during the demolition of a building. *See Clarksville-Montgomery Cnty. Sch. Sys. v. U.S. Gypsum Co.*, 925 F.2d 993, 995-96 (6th Cir. 1991).

The evidence overwhelmingly shows that, although the parties' contracts and industry practice required A.R. to adhere to numerous safety regulations when removing asbestos, A.R. did not do so. Quite to the contrary, the undisputed evidence demonstrates A.R. consciously disregarded the safety of the public when it failed to remove ACM before demolishing a

building, and also illegally buried ACM on more than 40 properties in the City. Accordingly, a punitive damages award is warranted against A.R. *Cf. Cantrell v. GAF Corp.*, 999 F.2d 1007, 1017 (6th Cir. 1993) (upholding punitive damages award against employer under Ohio law on the grounds that it consciously disregarded the safety of its employees by exposing them to asbestos).

### C.  Punitive Damages Calculations

The Court next must determine whether a punitive damages award of $906,189.06 (double the amount of compensatory damages), or some other amount, is reasonable under the facts of this case. The following factors should be considered in determining whether a punitive damages award is reasonable:  the reprehensibility of the defendant's misconduct; the disparity between the amount of compensatory damages and punitive damages; and whether similar awards of punitive damages have been awarded in other cases. *See Bach v. First Union Nat'l Bank*, 486 F.3d 150, 153 (6th Cir. 2007) (citing *State Farm Mut. Auto Ins. Co. v. Campbell*, 537 U.S. 408, 419-28 (2003)).

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996). Here, many of the indices of reprehensibility that were identified by the U.S. Supreme Court in *State Farm* are present:  A.R. caused physical harm to the environment and the public; A.R.'s "tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others"; A.R.'s conduct involved repeated actions; and "the harm was the result of intentional malice, trickery, or deceit." *State Farm*, 538 U.S. at 419; *see also Bach*, 486 F.3d at 153. Therefore, a large award of punitive damages is justified based on A.R.'s highly reprehensible conduct. *Cf. Wightman v. Consol. Rail Corp.*, 715 N.E.2d 546, 553-55 (Ohio

1999) (upholding a $15 million punitive damages award based on the defendant's highly reprehensible conduct in disregarding the health and safety of the public – *i.e.,* failing to take measures to protect motorists from train collisions).

Further, Ohio courts have held that doubling the amount of compensatory damages for a punitive damages award is not excessive.[8] *See, e.g., Faieta v. World Harvest Church*, 891 N.E.2d 370, 404-05 (Ohio Ct. App. 2008); *see also* Ohio Rev. Code § 2315.21. Accordingly, the Court finds that a punitive damages award of $906,189.06 is warranted under the egregious facts of this case.

## IV. Declaratory Relief

Finally, the City requests declaratory relief. The City first seeks a declaratory judgment that A.R. is required to defend, indemnify, and hold the City harmless from all claims arising from A.R.'s conduct. *See* doc. 91 at PageID 509. The Court finds that the City is entitled to such relief. The City's contracts with A.R. required it "[t]o the fullest extent permitted by law … defend, indemnify and hold harmless the City … from and against all claims, damages, losses, and expenses, direct, indirect or consequential arising out of or resulting from the [w]ork." Ex. 4

---

[8] Ohio does have a statute limiting an award of punitive damages in tort actions to twice the amount of compensatory damages; or 10% of an individual's or small employer's net worth not to exceed $350,000. *See* Ohio Rev. Code § 2315.21. However, the statute does not limit the award of punitive damages in this instance for two reasons. First, in *Beaumont v. Albert*, the Ohio Court of Appeals for the Twelfth District held that this statutory damages cap does not apply in this instance – where the plaintiff is awarded punitive damages based on a breach of contract claim that also constituted a tort. *Beaumont*, No. 2009-03-06, 2009 Ohio App. LEXIS 5186, at *12, 2009 WL 4043387, at *13 (Ohio Ct. App. Nov. 23, 2009). As noted above, this Court should apply law from the Ohio Courts of Appeals when there is no Ohio Supreme Court case on-point, published or unpublished, "unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Mich. First Credit Union*, 641 F.3d at 251-52. Second, there has been no evidence presented concerning A.R.'s net worth or whether it is a "small employer," and it is A.R.'s duty to present such evidence. *See Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479, 489-90 (6th Cir. 2002); *Caraman v. Bailey*, No. 94986, 2011 Ohio App. LEXIS 409, at *3-4, 2011 WL 346298, at *1 (Ohio Ct. App. Feb. 3, 2011); *Doepker v. Willer Sec., Inc.*, No. 2007 CA 00184, 2008 Ohio App. LEXIS 1711, at *12-14, 2008 WL 1850970, at *6 (Ohio Ct. App. Apr. 7, 2008).

at 78. As noted above, the City's well-pled factual allegations relating to liability are accepted as true. *See Antoine*, 66 F.3d at 110. To that end, the City's factual allegations in its complaint, as well as the evidence presented at the damages hearing, establish that A.R. violated federal, state and local laws and regulations in performing asbestos remediation and other asbestos-related work under the contracts. *See* doc. 1 at PageID 34-35; Exs. 1-3. As a result of A.R.'s illegal activities, the City has received multiple violation notices from RAPCA, and will incur substantial costs to remove the illegally buried asbestos. Accordingly, under the indemnification clause in their contracts, A.R. is required to defend, indemnify and hold the City harmless from all claims and damages arising from its work under the contracts.

Second, the City seeks a declaratory judgment that A.R. is liable under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") – specifically, 42 U.S.C. § 9607(a) – for costs associated with the remediation at the properties where A.R. illegally disposed of ACM. *See* doc. 91 at PageID 5010. CERCLA provides for recovery of "necessary costs of response"[9] from an entity that is responsible for the "release" of "hazardous substances" at a "facility," as those terms are defined in the statute. *Vill. of Milford v. K-H Holding Corp.*, 390 F.3d 926, 933 (6th Cir. 2004). The City has pled a *prima facie* claim for CERCLA liability, and those complaint allegations are accepted as true upon A.R.'s default. *See* doc. 1 at 28-33; *Antoine*, 66 F.3d at 110. Asbestos is a "hazardous substance" under

---

[9] The response costs must also be "consistent" with the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. § 300.1, *et seq.* ("National Contingency Plan"). *Reg'l Airport Auth. v. LFG, LLC*, 460 F.3d 697, 707 (6th Cir. 2006). "A contamination cleanup is consistent with the NCP [National Contingency Plan] 'if, taken as a whole, it is in 'substantial compliance' with 40 C.F.R. § 300.700(c)(5)-(6), and results in a 'CERCLA-quality cleanup.'" *Id.* The Court accepts as true the City's statement in its complaint that its response costs are necessary and have been consistent with the National Contingency Plan. Doc. 1 ¶ 17.

CERCLA.  *See* 42 U.S.C. § 9601(14);[10] *CP Holdings, Inc. v. Goldberg-Zoino & Assocs., Inc.*, 769 F. Supp. 432, 436 (D.N.H. 1991).  Further, burying asbestos on the properties constitutes a "release."  *See* 42 U.S.C. § 9601(22); *United States v. Domenic Lombardi Realty, Inc.*, 204 F. Supp. 2d 318, 330 (D.R.I. 2002). Third, the various properties were "facilities," defined as "any site where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."  *See* 42 U.S.C. § 9601(9); *Metate Asbestos Corp.*, 584 F. Supp. at 1148.  Accordingly, pursuant to 42 U.S.C. § 9607(a), A.R. is liable to the City for its necessary response costs connected with the illegally buried asbestos.

### IT IS THEREFORE ORDERED AND DECLARED AS FOLLOWS:

1. Judgment is entered in favor of Plaintiff City of Dayton and against Defendant A.R. Environmental, Inc.;

2. Plaintiff City of Dayton is entitled to $453,094.53 in compensatory damages against Defendant A.R. Environmental, Inc.;

3. Plaintiff City of Dayton is entitled to $906,189.06 in punitive damages against Defendant A.R. Environmental, Inc.;

4. Plaintiff City of Dayton is entitled to court costs, and statutory interest from the date of this judgment entry;

5. Defendant A.R. Environmental, Inc. is required to defend, indemnify and hold Plaintiff City of Dayton harmless from all claims and damages arising out of, or resulting from, its work under its contracts with the City of Dayton, as more fully explained in this opinion; and

6. Defendant A.R. Environmental, Inc. is liable under 42 U.S.C. § 9607(a) for Plaintiff City of Dayton's response costs – that are necessary and consistent with the National Contingency Plan – in connection with the asbestos-containing material that was illegally buried on the City of Dayton properties by Defendant A.R. Environmental, Inc.

---

[10] Under 42 U.S.C. § 9601(14), a substance is "hazardous" if it is already regulated by another environmental act.  Asbestos is regulated under both the Federal Water Pollution Control Act and the Clean Air Act.  *United States v. Metate Asbestos Corp.*, 584 F. Supp. 1143, 1146 (D. Ariz. 1984).

The Clerk is **ORDERED** to serve a copy of this Order upon the statutory agent for A.R. Environmental, Inc.: Sherman B. Bradley, 1558 Nathaniel Drive, Cincinnati, Ohio 45420.

October 29, 2012                                                  s/ **Michael J. Newman**
                                                                    United States Magistrate Judge